CORBET TRUOG; and KIMBERLY
TRUOG,

    Plaintiffs,

v.                                      Case No. 6:17-cv-2088-Orl-37KRS

MID-AMERICA APARTMENT
COMMUNITIES, INC.,

    Defendant.
_____

## ORDER

This case concerns horrific facts: the sexual assault of an eight-year-old boy by his fourteen-year-old male babysitter. (Doc. 2, ¶¶ 12, 15, 20; Doc. 53-2, p. 49:6–10.) Defendant Mid-America Apartment Communities, Inc. ("**MAA**") operates the apartment complex where the assault took place and where both minors resided with their families. (Doc. 2, ¶¶ 9, 11–20.) Plaintiffs are the victim's parents. (*Id.* ¶ 12.) At issue is whether MAA, as Plaintiffs' landlord, can be held liable for the assault because it knew that the babysitter sexually assaulted another minor tenant on the premises six months before and did nothing in response. (*Id.* ¶¶ 16–19, 31–37.) MAA moves for summary judgment against Plaintiffs, contending no duty to warn arose from the prior assault; and that even if a duty existed, Plaintiffs cannot establish causation. (Doc. 53, pp. 10–18 ("**Motion**").) Plaintiffs maintain that MAA had a duty to protect Plaintiffs from reasonably foreseeable criminal activity and disputed material facts remain that render summary judgment

inappropriate. (Doc. 56, pp. 7–16.) On review, the Court finds that the Motion cannot be granted on this record, so the matter will proceed to trial.

## I.   BACKGROUND[1]

Plaintiffs Corbet and Kimberly Truog have been married since August 12, 2006. (Doc. 56-1, p. 7:19–25.) They have one son, B.T., born in 2007. (*Id.* at 8:1–15.) In late 2013, Plaintiffs moved to Lake Mary, Florida—it was more convenient for Mr. Truog's commute to work and had a reputation of being very safe and great for families. (Doc. 53-1, p. 12:15–23.) They toured apartment complexes and one stood out: Colonial Grand at Heathrow ("**Colonial Grand**"). (*Id.* at 12:24–13:1.) As Mrs. Truog put it, "it had a very homey nature." (*Id.*) When taking a tour, they noticed children outside, which "seemed better for B.T. to have friends as opposed other communities that [they] looked at that didn't look as kid-friendly." (*Id.* at 13:1–6.) So they signed a lease at Colonial Grand on November 8, 2013 and moved in shortly after. (*Id.* at 15:1–14.)

As a community, Colonial Grand had a lot of children who would play together in the common areas and ride the bus to school—over thirty. (*Id.* at 15:15–22; Doc. 56-1, p. 21:11–16.) Through these encounters, B.T. met A.O., his eventual assailant. (Doc. 56-1, pp. 21:20–22:1; Doc. 53-1, p. 15:15–25.) B.T. was around five or six at the time; A.O. was maybe twelve. (Doc. 56-1, pp. 22:2–4, 20–22.) Despite the age difference, they played

---

[1] The facts recited here are not the actual facts of the case. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Rather, they reflect Plaintiffs' "best case"—that is, the Court must consider the facts in the light most favorable to Plaintiffs. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005); *see also Walker v. City of Riviera Beach*, 212 F. App'x 835, 837 (11th Cir. 2006).

together, growing "fond of one another" (Doc. 53-1, p. 16:7–19.) According to Mrs. Truog, A.O. was "very respectful," leading her to be "really impressed by [his] behavior" and "how pleasant he was." (*Id.* at 16:8, 18:24–19:9.) All in all, the Truogs "just thought he was a normal kid." (Doc. 56-1, p. 23:23–24.)

After A.O. got to know B.T., he asked Mrs. Truog if he could babysit B.T. (Doc. 53-1, p. 21:8–13.) She said no, based on his young age, but he kept asking her at least once a month for about a year to a year and a half. (*Id.* at 21:15–22:9; Doc. 56-1, p. 26:3–12.) Then, she relented. (Doc. 53-1, p. 22:10–17.) A.O. was fourteen; B.T. was eight. (Doc. 53-2, p. 25:5–13; 53-3, p. 20:16–17.) At that point, Mrs. Truog:

> had never seen anything from him that would make [her] feel that [her] son would be in danger. And so [she] thought, Kim, why are you giving him such a hard time, you know. He's definitely of age to be able to babysit. It's just one child; it's not multiple children, you've known him for . . . a long time. Met his dad, you know, his sister, been neighbors for a long time, and he's always been very respectful and responsible.

(*Id.* at 32:7–17.) So she suggested to her husband they "just go out for a brief evening alone, and that [A.O.] can earn some money." (*Id.* at 32:18–22.) They settled on dinner and a movie, close by if anything came up, the evening of January 23, 2016. (*Id.* at 32:23–33:4; Doc. 56-1, pp. 25:23–26:1.) Mrs. Truog made sure A.O. had his cell phone with him when he arrived, left a number for A.O. to reach her, and got pizza for the boys. (Doc. 53-1, pp. 33:8–20.) They left and heard nothing from A.O. until Mrs. Truog checked in after the movie. (*Id.* at 36:24–37:1, 39:11–13.) She texted him at 10:48 p.m. to say the movie was over and ask how everything was going. (*Id.* at 38:7–8.) He wrote back immediately, "Good." (*Id.* at 38:9.) The Truogs arrived home shortly after. (*Id.* at 38:24–25.)

-3-

On arriving home, Mrs. Truog found B.T. in his room. (*Id.* at 40:24–41:10.) His face was red, and she could tell he had been crying. (*Id.* at 41:10.) A.O. was in the bathroom, either showering or having just showered. (*Id.* at 41:2–6.) Immediately, Mrs. Truog knew something was off. (*Id.* at 41:6.) She and her husband asked B.T. what happened, but he "seemed very hesitant to disclose what transpired because A.O. was still there." (*Id.* at 41:12–15.) A.O. then came out of the bathroom, and the Truogs asked him what happened. (*Id.* at 41:11–12.) A.O "was very nervous," "shaking," and "knocked over" a liter of soda. (*Id.* at 41:23–25.) They all began cleaning up the mess with towels, but Mrs. Truog sent A.O. home so they could talk to B.T.—at that point, the "hair on the back of [her] neck was standing up, like something [was] really wrong." (*Id.* at 42:3–8.) She paid A.O., and he left. (*Id.* at 42:4.)

Mrs. Truog then immediately asked B.T. what happened. (Doc. 56-1, p. 34:10–19.) He told them: while he was taking a shower, A.O. got in. (*Id.* at 34:20–21.) B.T. told A.O to get out. (*Id.* at 34:22.) A.O. got out; they got dressed and played a game of basketball in B.T.'s room—on A.O.'s suggestion, if someone missed a shot, he had to take off a piece of clothing. (*Id.* at 34:22–25.) "So they ended up naked again together." (*Id.* at 35:2.) From there, A.O. performed oral sex on B.T. and made B.T. reciprocate. (*Id.* at 35:15–18.) A.O. then attempted anal sex on B.T. (*Id.* at 35:19–36:5.) B.T. vomited in his room and cried. (*Id.* at 36:6–12.) A.O. told B.T. that if he told anyone, A.O. would punch him in the face. (Doc. 53-1, pp. 42:20–43:3.)

On hearing this, Mrs. Truog texted A.O. at 11:09 p.m., "B.T. said you took a shower here." (*Id.* at 38:24–25.) He responded at 11:11 p.m., "Yeah, I just had to rinse the gel out

of my hair. It was making me itch." (*Id.* at 39:3–5.) At 11:12 p.m. he said, "Thanks for having me over." (*Id.* at 39:5–6.) Mr. Truog then called A.O. and asked him to come back to their apartment. (*Id.* at 43:11–44:2.) A.O. said, "Okay" and came back within minutes. (*Id.* at 44:4–6.) Mrs. Truog told A.O. that B.T. told her what "physically had transpired" and that she would take B.T. to the hospital "to check to see if something like that transpired." (*Id.* at 44:5–13.) She asked A.O. if the hospital would find anything, and he responded, "They might." (*Id.*) So initially "he denied it," but then "he admitted to what he had done" — "he agreed there was oral and attempted anal." (Doc. 56-1, p. 40:2–3, 10–13.)

Mr. Truog called 9-1-1. (*Id.* at 40:9.) Two police officers came and asked A.O. to step outside. (Doc. 53-1, pp. 45:10–46:2.) Meanwhile, A.O.'s mother wondered what was taking A.O. so long to come back, so she walked over to the Truogs' apartment. (Doc. 53-3, p. 21:1–5.) She met a police officer outside with A.O. (*Id.*; Doc. 53-1, p. 46:3–7.) Nothing happened with A.O. that night, he went home with his mother. (Doc. 56-1, p. 41:9–10.) But the Truogs, on suggestion from one officer, drove B.T. to Kids House in Sanford, a children's advocacy center. (*Id.* at 46:1–7; Doc. 53-2, p. 5:21–22.) There, a Child Protection Team Case Coordinator, Eunice Carasas-McIntosh, conducted a forensic interview of B.T. (Doc. 56-1, p. 46:18–23; Doc. 53-2, pp. 7:20–24, 12:2–13:13.) The interview lasted "through the night" (Doc. 56-1, p. 47:1), resulting in "verified findings of child-on-child sexual abuse" (Doc. 53-2, p. 19:4–6). The Truogs then went home. (Doc. 56-1, p. 47:2–4; Doc. 53-1, p. 61:18–22.)

Two days later, at school on Monday, A.O. was interviewed by law enforcement

officers and arrested. (Doc. 53-3, pp. 24:18–20, 26:1–27:1.) Ultimately, A.O. pleaded guilty to sexual battery. (*Id.* at 28:2.) He was placed on probation for three years and ordered to complete counseling, community service, and a court-ordered program. (*Id.* at 27:14–21.)

In the aftermath, the Truogs notified Colonial Grand about the assault and their intention to leave the apartment complex. (Doc. 53-1, p. 47:9–20.) They attempted to piece their lives back together, looking for a new place to live and putting B.T. in therapy. (*Id.* at 52–55; *see also* Doc. 56-2 (deposition of Dr. Richard Stout).) And Mrs. Truog discovered that in June 2015—six months before A.O. assaulted B.T.—A.O. sexually assaulted C.S., a thirteen or fourteen-year-old girl who formerly resided at Colonial Grand. (Doc. 53-5, pp. 12:4–6, 16:12–13; Doc. 53-6, pp. 22:25–23:2.) Similar to A.O.'s relationship with B.T., A.O. and C.S. "were really good friends" before the assault. (Doc. 53-5, p. 10:4–5.) One day, they had been playing outside with some other kids visiting C.S.'s family. (*Id.* at 13:20–14:5.) At some point, A.O. and C.S. were alone, and A.O. got "touchy feely" with C.S., moving "closer" to her. (*Id.* at 14:6–12.) C.S. asked him what he was doing; he responded that he had "wanted this for a long time now"; she said she didn't "feel that way." (*Id.* at 14:13–15.) A.O. then "grabbed [C.S.'s] hands" to where "[she] couldn't do anything." (*Id.* at 14:18–20.) He grabbed her face and pulled her toward him, attempting to kiss her. (*Id.* at 14:20–22, 25:4–7.) They struggled, with C.S. telling him to stop and attempting to get away. (*Id.* at 22:25–25:7.) Eventually she pushed him in the stomach and escaped. (*Id.* at 29:21–30:3.) She collected the other kids and went home. (*Id.* at 30:4–9.)

C.S. told her parents what happened. (*Id.* at 34:12–15.) Her mother, Jaclyn Smartt, went to A.O.'s apartment and knocked on the door for fifteen minutes. (Doc. 53-6, p.

24:11–14.) No one answered. (*Id.*) So Mrs. Smartt told her daughter to stay away from A.O. at the bus stop the next day and tried tracking A.O.'s parents down. (*Id.* at 24:20–25:6.) She then heard from another mom that A.O. had been telling kids what happened but turned it around, saying "that C.S. was being forcible to A.O." (*Id.* at 25:11–16.) On hearing this, Mrs. Smartt talked to A.O. directly, as again his parents weren't home. (*Id.* at 25:18–20.) He first denied any attempt to place the blame on C.S. but eventually admitted, "You're right. I'm wrong. I did this. I apologize." (*Id.* at 25:20–25.)

Mrs. Smartt also reported the assault to Colonial Grand's manager, Pamela Albert. (*Id.* at 10:20–11:8.) As Mrs. Smartt recounts,

> I went in there and told her that we needed to speak about something that was pretty important. She shut the door. I sat down in front of her, and I explained to her what had happened at the park the day before and that I had reached out or attempted to reach out to A.O.'s parents but no success. I explained to her that there was—it had been explained to me a couple of years prior that A.O. was to be watched and he wasn't to be trusted because he had tried to assault a little boy. A.O. was a big part of our lives. He was my daughter's best friend for a number of years. I tried to take that and leave it back, but I explained to her that, you know, he did this to my daughter and she—she was scared. She was crying, like, shaking scared. And Pam just kind of sat there and was like, Oh, my God, you know, that's horrible. But at no point was she taking notes, was she—and I had her turn around to see the apartment in which I was talking about because you could see his apartment from her window and I told her it was that one on the corner on the bottom and she said, That's the Owens. And I said, Yes.

(*Id.* at 13:11–14:5.) On telling Pamela Albert "what he did to [her] daughter" and "what [she] had heard about his previous crime that he had committed," Mrs. Smartt asked Pamela "to deal with it appropriately, to reach out to the parents or to tell [her] what [she] can do." (*Id.* at 27:18–28:9.) That same day, on her way to the office, Mrs. Smartt also told a police officer about the assault; she spotted him driving around the community. (*Id.* at

-7-

26:13–21, 31:11–18.) He apparently told her she could do nothing because C.S. got away. (*Id.* at 26:17–21, 27:9–16.)

The Smartts moved out of Colonial Grand within days of the assault. (*Id.* at 15:19–21.) Mrs. Smartt has heard nothing from Pamela Albert since. (*Id.* at 34:7–10.) But Mrs. Smartt has spoken to Mrs. Truog, as a mutual friend connected them after hearing that A.O. assaulted B.T. (*Id.* at 16:1–18:3; *see also* Doc. 53-1, pp. 22:18–27:5.) Mrs. Smartt told Mrs. Truog that A.O. assaulted C.S., that she spoke with a police officer, and that she went to Colonial Grand's office and "spoke with Pam about the specifics of what transpired." (Doc. 53-1, pp. 25:8–26:14.)

Pamela Albert never contacted A.O.'s parents to tell them he assaulted C.S. (Doc. 53-3, pp. 14:23–25 (A.O's mother's deposition); Doc. 53-4, p. 12:17–22 (A.O's father's deposition).) According to A.O.'s parents, had they known, they would not have let A.O. babysit B.T. (Doc. 53-3, p. 32:9–14; Doc. 53-4, p. 32:6–13.) Indeed, Pamela Albert vehemently denies that Mrs. Smartt ever told her about the sexual assault. (Doc. 53-7, pp. 23:5–25:23, 29:9–13.) C.S.'s assault took place in June 2015—six months before A.O. assaulted B.T. (Doc. 53-6, pp. 22:25–23:1; Doc. 56-1, pp. 25:23–26:1.) According to MAA's expert, the "minimum" appropriate response by the property manager would have been "an attempt to contact the Owens parents and bring them in" and "hand [Mrs. Smartt] the phone and say call the cops right now." (Doc. 53-8, pp. 31:23–33:9; *see also id.* at 35:8–19.) In addition, the property manager could have posted a generic notice there had been reports of inappropriate behavior at the playground with a warning for parents to watch their children, revealing no specific information about A.O. (*Id.* at 35:20–36:7.)

The Truogs sued MAA for negligent failure to warn, specifically based on MAA's duty as landlord to protect its residents from reasonably foreseeable criminal conduct where it knew of prior similar criminal conduct on the premises. (Doc. 1, ¶¶ 31–37.) MAA has moved for summary judgment. (Doc. 53.) Briefing complete (Docs. 56, 57), the Motion is ripe.

## II. LEGAL STANDARDS

Summary judgment is appropriate only if the movant shows there is no genuine dispute on any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On issues for which the movant would have the burden to prove at trial, it must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on the essential elements. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys*, 941, F.2d 1428, 1438 (11th Cir. 1991)).

On issues for which the nonmovant would bear the burden of proof at trial, the movant has two options: (1) it may simply point out an absence of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp.*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320

(11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, *Battle*, 468 F.3d at 759, so "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.    DISCUSSION

MAA seeks summary judgment on two separate grounds. (Doc. 53.) First, MAA claims that no duty arose because it lacked knowledge of the prior assault by A.O. based on Pamela Albert's testimony that Mrs. Smartt never reported it. (*Id.* ¶ 9.) Yet, assuming that Mrs. Smartt reported the assault to Pamela Albert, MAA claims that her report created no duty on MAA to take any action, as the underlying conduct was neither similar to A.O.'s assault of B.T. nor criminal. (*Id.*; *see also id.* at 11–14; Doc. 57, pp. 2–3.) Second, MAA argues that Plaintiffs' causation arguments fail because they impute liability by

-10-

stacking inferences. (Doc. 53, ¶¶ 11–12.) The Court starts and ends its analysis with the first issue: whether, for summary judgment purposes, the facts in Plaintiffs' best light establish a duty on MAA's part.

There are four elements to negligence under Florida law: (1) a legal duty owed by the defendant to the plaintiff; (2) breach of that duty by the defendant; (3) an injury to the plaintiff legally caused by the defendant's breach; and (4) damages resulting from the injury. *Paterson v. Deeb*, 472 So. 2d 1210, 1214 (Fla. 1st DCA 1985). "As a basic principle of law, a property owner has no duty to protect one on his premises from criminal attack by a third person." *Sch. Bd. of Palm Beach Cty. v. Anderson*, 411 So. 2d 940, 941 (Fla. 4th DCA 1982). Yet Florida law recognizes a "special relationship" between landlords and tenants that, in certain circumstances, gives "rise to a duty to protect against foreseeable third-party criminal acts." *T.W. v. Regal Trace, Ltd.*, 908 So. 2d 499, 504 (Fla. 4th DCA 2005). For this duty "to arise, it must be proven that the landlord has knowledge of prior similar criminal conduct." *Id.*; *see also Paterson*, 472 So. 2d at 1214 ("[T]o impose such a duty upon the landowner, the invitee must allege and prove that the landowner had actual or constructive knowledge of prior *similar* acts committed upon invitees on the premises because a landowner should not be required to take precautions against a sudden attack which the landowner has no reason to anticipate.").

Determining whether a duty exists is a factually sensitive inquiry. Two cases are particularly instructive for this context. In *T.W.*, the plaintiffs were a mother and her daughter, T.W., who were tenants at an apartment complex where another tenant sexually assaulted a nine-year-old girl. 908 So. 2d at 501. Two weeks later, the same tenant

followed T.W. on her walk to school, approached her, and took her to an abandoned building where he sexually assaulted her. *Id*. The plaintiffs sued the apartment complex for negligence because after the first assault, another tenant had called the property manager to report what happened. *Id*. The property manager told the tenant to tell the girl's mother to call the office; the mother called and directed the property manager to her attorney. *Id*. The mother never directly told the property manager what happened. *Id*. at 501–02. A few days later, law enforcement contacted the property manager, but the manager testified that the officer told her not to inform residents of the situation to prevent hysteria—which law enforcement later disputed. *See id*. at 501–02. So the property manager took no action. *Id*. Yet after T.W. was assaulted, a flyer describing the assailant was circulated to residents. *Id*. at 502. This led to his arrest and eviction. *Id*.

On those facts, the court considered whether a duty to protect against foreseeable third-party criminal acts arose. *Id*. at 504–05. As the plaintiffs "asserted a duty to protect against sexual assault . . . the question [was] whether [they] presented evidence that [the apartment complex] had actual or constructive knowledge of the prior sexual assault." *Id*. at 505. And "without question," the apartment complex:

> at least knew that such an assault allegedly occurred, because it admitted being told of the assault by a tenant and law enforcement, even if not told of the precise details of the assault. Because of [the apartment complex's] knowledge that some sort of sexual assault had occurred against [the nine-year-old girl] on its premises, likely by a tenant, and because it had a landlord-tenant relationship with [the plaintiffs], it had a duty to protect against the foreseeable criminal acts of third parties within the course of that special relationship, in this case by warning tenants about those foreseeable acts.

*Id*. The warning required was "basic," not a "full account of the assault" but "about

alleged criminal sexual activity presumably perpetrated by one tenant on a tenant child," letting tenants know that "a tenant was targeting tenant children" there. *Id.* at 507. So in those circumstances, "a duty existed as a matter of law." *Id.*

The court reached the same conclusion in *Lambert v. Doe*, 453 So. 2d 844, 848 (Fla. 1st DCA 1984). There, a twelve-year-old tenant, Sean Roe, sexually molested a nine-year-old tenant, Steven Doe, three times in August and September 1980. *Id.* at 845. Two assaults occurred in the apartment complex—one at the Doe's apartment and one at the Roe's apartment while the parents were elsewhere. *Id.* Before Steven was assaulted, the apartment complex's management had received several "reports of assaultive and bizarre conduct by Sean." *Id.* at 846. These included reports that Sean had sexually molested other tenant boys, including a three-year-old. *Id.* The three-year-old's mother reported the assault to the property manager and then moved out the next month because "management did not require Sean's family to move." *Id.*

Beyond this, a maintenance employee reported several issues with Sean to management beginning in 1979, including that he "posed a threat to small children at the [apartment complex]" and that "he liked little boys rather than little girls," which the manager "took to mean that Sean was prone to making sexual advances towards small children." *Id.* at 847. And although the apartment complex's project manager hired a part-time security guard to "investigate reports that Sean had sexually molested younger boys in the complex," the investigator uncovered no "concrete" information—he didn't interview the three-year-old's mother or the witness to that assault though. *Id.* at 846. Ultimately, the investigator filed a report with the Sheriff's Office that "did not reveal any

facts showing misconduct on the part of Sean." *Id.* meanwhile, the apartment complex's management "discussed evicting the Roes" because of Sean's conduct but ultimately didn't "because they felt there was not sufficient evidence." *Id.* at 847.

With all this, the court found that "[e]nough information was known by [the apartment complex's] management about Sean Roe such that it knew or should have known that it was reasonably foreseeable that Sean would continue to victimize young children in the complex." *Id.* at 848. As landlord, the apartment complex had "the duty of warning Steven's parents of the threat posed by Sean or taking other reasonably available precautions to avoid Steven and the other young children in the complex from continuing to be victimized by Sean." *Id.*

Taken together, *T.W.* and *Lambert* establish that a landlord's duty to protect tenants from reasonably foreseeable criminal activity exists when notified that a tenant has allegedly sexually assaulted a tenant child—despite police involvement, the existence of allegations only, the lack of direct reporting from the child's parent, not knowing specifics about the assault, and differences in victim age and type of assault. Such is the case here, where the facts construed in Plaintiffs' favor reveal that Mrs. Smartt notified MAA's property manager Pamela Albert that: (1) A.O. sexually assaulted her daughter; and (2) she heard from another tenant that A.O. had attempted to assault a little boy. (*See* Doc. 53-6, pp. 13:11–14:5.) That Mrs. Smartt testified about this report means that Plaintiffs "have presented evidence that [MAA] had actual or constructive knowledge of the prior assault of [C.S.]." *T.W.*, 908 So. 2d at 505.

"Because of [MAA's] knowledge that some sort of sexual assault had occurred

against [C.S] on its premises" by A.O. and its "landlord-tenant relationship with [Plaintiffs], it had a duty to protect against the foreseeable acts of [A.O.] within the course of that special relationship." *Id.* And like *T.W.* and *Lambert*, the Court finds that MAA's "duty encompassed warning." *Id.* at 506; *Lambert*, 453 So. 2d at 848. As MAA's expert expounded, a sufficient warning here would have included notifying A.O.'s parents and handing the phone to Mrs. Smartt to call the police. (Doc. 53-8, pp. 31:23–33:9.) Beyond this, MAA could have posted a generic notice warning parents of inappropriate behavior at the playground without identifying A.O. specifically. (*Id.* at 35:20–36:7.) Either way, MAA's knowledge that A.O. assaulted C.S. "was sufficient for a reasonable apartment complex to recognize that its tenants would be exposed to risk if not warned." *T.W.*, 908 So. 2d at 506. This "duty existed as a matter of law." *Id.* at 507.

That said, whether MAA breached its duty is for the jury. *Lambert*, 453 So. 2d at 848. Indeed, "it is for the jury to determine what precautions are reasonably required of the landlord in order to protect its tenants from further foreseeable criminal activity." *Id.*; *see also T.W.*, 908 So. 2d at 507 (citing *Selvin v. DMC Regency Residence, Ltd.*, 807 So. 2d 676, 682 (Fla. 4th DCA 2001) ("Because a duty existed as a matter of law, it is for a jury to decide whether [the apartment complex] breached that duty.")). Such is "peculiarly a jury function" because "what is and what is not reasonable care under the circumstances is, as a general rule, simply undeterminable as a matter of law." *Id.* (citing *Selvin*, 807 So.2d at 682). The Court finds no grounds to deviate from this standard course here, where resolving this case now turns wholly on questions of fact—including MAA's causation argument. (*See* Doc. 53, pp. 14–17; Doc. 56, pp. 13–16); *cf. Sanders v. ERP Operating Ltd.*

*P'ship*, 157 So. 3d 273 (Fla. 2015) (distinguishing factual issues regarding proximate cause from inferences stacking doctrine for court). Summary judgment is therefore denied.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant Mid-America Apartment Communities, Inc.'s Motion for Summary Judgment (Doc. 53) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on February 12, 2019.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record